UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

EQUITY RESOURCES, INC,
        Plaintiff,

                              Case No. 2:21-cv-5922
      v.                          Judge Edmund A. Sargus, Jr.
                              Magistrate Judge Chelsey M. Vascura

KELLY M. THOMAN, et al.,

        Defendants.

## OPINION AND ORDER

       This matter arises on Defendant's Motion for Summary Judgment. (ECF No. 47). Also addressed in this order is Plaintiff's simultaneously filed Motion for Partial Summary Judgment. (ECF No. 46). For the reasons stated below, Defendant's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's Motion for Partial Summary Judgment is **DENIED**.

### I.      Procedural Background

    On November 24, 2021, Plaintiff Equity Resources Inc. ("Equity") filed an action against Defendants Kelly M. Thoman, Larry, E. Dugger, April S. Roberts and T2 Financial LLC dba Revolution Mortgage (Revolution) in Licking County, Ohio Court of Common Pleas. (ECF No. 1, at 1). On December 29, 2021 the parties moved jointly to remove this action from Licking County to the United States District Court for the Southern District of Ohio, Eastern Division. (*Id.*). As litigation unfolded, Plaintiff moved to dismiss its asserted claims against individual defendants Kelly Thoman, April Roberts, and Larry Dugger. (ECF No. 25). The Court granted this motion, leaving Revolution as the only remaining Defendant. (ECF No. 26). Plaintiff's amended complaint alleged twelve counts, of which Counts Two, Four, Five, Eight, Nine, and

Ten survive. (ECF Nos. 7, 26). These claims are "Tortious Interference with Advantageous Business Relationships and Prospective Economic Advantage," "Conversion," "Unfair Competition," "Civil Conspiracy," "Misappropriation of Trade Secrets in Violation of Ohio's Uniform Trade Secrets Acts," and "Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*." (ECF No. 7, at 15–22).

On March 31, 2023, roughly six months after dismissing the three defendants, Plaintiff Equity and Defendant Revolution each filed their own respective motions for summary judgment. (ECF Nos. 46, 47). Each party responded to their opposition's motion on April 24, 2022. (ECF Nos. 53, 55). Finally, they filed their replies in lockstep on May 8, 2023. (ECF Nos. 59, 60).

## II.     Factual Background

Equity Resources, founded in 1994 and based in Licking County, Ohio, is a mortgage lender with offices in several states. (ECF No. 46, at 5); (ECF No. 7, at 3). Revolution is a competitor in the mortgage business. (ECF No. 46, at 1).

Equity employed April Roberts, Larry Dugger, and Kelly Thoman ("Former Employees") as loan officers in its Cary, North Carolina branch. (ECF No. 46, at 5); (ECF No. 55, at 15). Thoman was employed as a junior loan officer under Dugger and Roberts, who were both loan officers. (ECF No. 47, Exhibit 1, at 1). Dugger and Roberts, who were dating during their time at Equity, are now married. (*Id*.). The two worked from North Carolina, while Thoman performed her job remotely from Ohio. (ECF No. 47, at 1). All three signed a confidentiality agreement with Equity, acknowledging that their job duties would bring them into contact with

company secrets.  (ECF No. 46, Exhibit 1, at 4; 4–5).  The employees agreed to not divulge these secrets, and to use them only for Equity's benefit.  (*Id*.).

Dugger and Roberts began their employment at Equity as experienced loan officers.  (ECF No. 53, at 2).  They came to the organization with their own preestablished skill sets, as well as their own contact and client lists.  (ECF No. 47, Exhibit 1, at 3; Exhibit 2, at 1).  These lists are valuable to companies in the mortgage field, as they can lead to future business.  Equity maintains its own list of customers and potential customers.  (ECF No. 46, at 3).  Roberts avers that she and Dugger added their personal lists into this larger database when they entered Equity's employ.  (ECF No. 53, Exhibit 1, at 3).  Plaintiff has not produced any evidence, or made any argument, indicating that the Former Employees gave up ownership of their own contact/client list.

While still employed at Equity, Roberts obtained a customer list from the company's database.  (ECF No. 47, Exhibit 1, at 3).  This list included non-public information ("NPI") about various individual customers.  She avers that the list included only the customer information she had brought with her to Equity.  (*Id*., at 2).  Equity disputes this.  (ECF No. 46, at 4).  Roberts communicated with Revolution employees, including Revolution's Chief Compliance Officer, Sally Wood, about adding this customer list to Revolution's own database.  (ECF No. 46, Exhibit 2, at 40).  The record reflects that Roberts did indeed upload the customer list to Revolution's database.  (*Id*.).  A few weeks after beginning her employment with Revolution, Roberts emailed herself a set of instructions (the Encompass Instructions) "relating to subordinating second mortgages and refinancing first mortgages, and inputting information related to these transactions into Equity Resources' loan origination system."  (ECF No. 46, at 4).

Revolution began recruiting Former Employees sometime in early 2021, starting with Dugger and Roberts. (ECF No, 47, Exhibit 11, at 13). Their efforts bore fruit on Friday April 16, 2021, when Dugger and Roberts informed Equity that they were leaving for Revolution. (*Id*., Exhibit 15, at 13); (ECF No. 53, Exhibit 1, at 1). Dugger and Roberts deny giving Thoman any advance notice of their departure, and Plaintiff has not presented any contradictory evidence. (ECF No. 47, Exhibit 1, at 2). Dugger and Roberts asked and received permission to retain their laptops over the weekend from their former boss at Equity, Tony Anderson. (*Id*.). Their stated reason was so that they could prepare for the formal end of their employment, Monday April 19. (*Id*.).

During the weekend, on Sunday April 18, Roberts testified that he asked Anderson if Thoman could monitor her email and those of Dugger after their departure. (ECF No. 47, Exhibit 1, at 2). Anderson acquiesced and Thoman did as asked. (*Id*.). Roberts avers that "Thoman monitored my and Dugger's old (Equity) email addresses, and forwarded me and Dugger borrower referrals, leads and other emails when they were addressed to us." (*Id*., at 3). However, Equity soon disciplined Thoman for her communications with Dugger and Roberts. The company accuses her of sending "sending non-public customer information, including social security numbers, dates of birth, and credit information" to Revolution, in contravention of Equity's policies. (ECF No. 46, at 4). Anderson testified that Thoman was told "not to communicate… Not to be providing customer information to [Roberts] and [Dugger]." (ECF No. 47, Exhibit 10, at 106–107). Following this action, Thoman too chose to join Revolution. Defendant's employee Sally Wood testified that Thoman reached out to Revolution first, but Plaintiff contests this order of events. (ECF No. 55, Exhibit 4, at 22). Thoman herself averred that a recruiter reached out to her. (ECF No. 46, Exhibit 7, at 13). Whatever the order of

4

operations, it is undisputed that Thoman entered Revolution's employment on June 14, 2021. (ECF No. 46, Exhibit 2, at 22).

Revolution points out that it requires all new hires to sign an agreement affirming that they have not taken any propriety information from their former employers.  Indeed, upon entering Revolution's employment, the Former Employees signed an employment agreement, which included a clause titled "No Breach of Prior Agreement Addendum to Employment Agreement." (ECF No. 47, Exhibit 4, at 6).  The relevant portion is as follows:

> Employee further represents and warrants that he has brought no proprietary information, confidential business operational policy material or confidential borrower information from any prior employer which would breach any prior agreement which the Employee has been party to at any time to [Revolution]

*Id.*

Equity contacted Revolution about the trade theft issue sometime after July 21, 2021, through a cease-and-desist letter.  (ECF No. 47, Exhibit 4, at 9).  Revolution asserts that this was when it initially became aware of any trade secrets issues.  (ECF No. 47, at 13).  Equity sent Revolution this letter, informing it of "emails showing that former Equity loan officers improperly sent borrower and loan information to themselves to divert loans from Equity to Revolution."  (ECF No. 47, Exhibit 4, at 9).  Equity proceeded to "demand that Revolution, through its employees or agents, immediately cease and desist diverting and/or using borrower information from Equity." *Id.*  Revolution's Chief Compliance Officer asserts that, by the time the company received this letter, it had already closed on twenty of the twenty-two loans that had been "diverted" from Equity.  (*Id.*, at 3) (quotation in original).  No evidence has been presented to the contrary, nor any showing that Defendant diverted any further borrower information after receiving this letter. Further, the letter made no mention of the purportedly stolen "step-by-step instructions regarding

5

subordinating second mortgages and refinancing first mortgages." (ECF No. 46, at 6). It was also not included in response to Defendant's interrogatory asking Plaintiff to "[i]dentify each trade secret of Equity that has been misappropriated," nor in any supplements. (ECF No. 47, Exhibit 8, 1–6).

### III.    Standard

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial, fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient;

there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment). It is with this standard in mind that the instant motions will be decided.

The moving party bears the burden of production first. "The moving party bears the burden of showing the absence of a genuine issue of material fact as to at least one essential element on each of Plaintiff's claims." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-moving party then must present sufficient evidence from which a jury could reasonably find for it. *See Anderson Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The court must determine "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52

## IV.     Analysis

Defendant contends that it is entitled to summary judgment on the remaining counts against it. (ECF No. 47). Plaintiff argues that it is entitled to summary judgment on Counts Nine and Ten. The Court will analyze each party's argument in turn.

### i.  Count Two

Defendant has moved for summary judgment on Count Two, Tortious Interference with Advantageous Business Relationships and Prospective Economic Advantage. (ECF No. 47). "Under Ohio law, a cause of action for [tortious interference with business relations] is made out when … one who, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into, or continue, a business relationship with another, or perform a contract

with another …." *Franklin Tractor Sales v. New Holland N. Am*., 106 F. App'x 342 (6th Cir. 2004) (citations omitted) (citing *Wright v. MetroHealth Med. Ctr*., 58 F.3d 1130, 1138 (6th Cir. 1995)). "The elements of Ohio's tortious interference with a business relationship are largely adapted from the Restatement (Second) of Torts § 766." *Kuvedina, LLC v. Cognizant Tech. Sols*., 946 F. Supp. 2d 749 (S.D. Ohio 2013). "The elements essential to recovery for a tortious interference with a business relationship are: (1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *First Star Logistics, LLC v. Bernard*, No. 1:16-cv-1070, 2020 U.S. Dist. LEXIS 243047 (S.D. Ohio Dec. 28, 2020) (citing *Gentile v. Turkoly*, 2017-Ohio-1018, ¶ 24, 86 N.E.3d 991, 997 (Ohio Ct. App. 2017)). "[I]nterference with the business relationship alone is insufficient to sustain a cause of action for tortious interference." *Gracetech Inc. v. Perez*, 2012-Ohio-700, ¶ 19. "It is the improper nature of the conduct that establishes liability." *Id*.

Defendant argues "Equity has produced no evidence to meet either the second or the third prong" of the tortious interference test, "knowledge by Revolution of Equity's relationships, or 'an intentional interference causing a breach or termination of the relationship [with Equity].'" (ECF No. 47, at 11). Defendant states further that "Equity has produced no evidence of any damages." (*Id*., at 15). Plaintiff pushes back, claiming that "the record demonstrates that Revolution was not only aware of the Former Employees' diversion of proprietary information from Equity to Revolution, but that Revolution actively encouraged and instructed them to do so." (*Id*.)

In support of the second and third prongs of the tortious interference test, Plaintiff points to Revolution's communications with Roberts. Plaintiff claims that "knowing that Roberts had

8

obtained Equity's confidential client database upon her departure from Equity, Revolution provided her with instructions on how to upload the database into Revolution's CRM system." (*Id*., at 20).  Plaintiff claims these loans would have been closed at Equity but were instead closed at Revolution.  (*Id*.).  Further, Plaintiff points out that Revolution must have known that the loans in question originated at Equity.  This is because its employees "solicited, received, and uploaded onto Revolution's CRM system completed loan applications that contained Equity's name, and on which Equity was listed as the mortgage lender."  (ECF No. 55, at 20).  The Court concurs with Plaintiff.

Plaintiff has satisfied its burden of showing a genuine dispute of material fact as to the second and third prongs of the tortious interference test.  When looked at in the light most favorable to Plaintiff, the completed loan applications containing Equity's name and the provision of instructions for uploading Roberts' client database to Revolution's systems establish Revolution's knowledge of the business relationship between the clients and Equity.  Similarly, uploading completed loan applications with Equity's name to its own database and the provision of instructions to transfer Robert's client database can establish an intentional interference causing breach of Equity's business relationship with its customers.  Defendant's argument fails.

Defendant next argues Equity has "produced no evidence of any damages," rendering its claim defective.  (ECF No. 47, at 15).  Defendant states that Plaintiff has failed to "provide a computation of its damages and evidence supporting its claims," despite repeated warnings. (*Id*.).  Thus:

> Having repeatedly warned Equity of the consequences of its decision to ignore its discovery obligations relating to computing and disclosing its damages, Equity is barred from introducing novel supporting evidence at trial. Without the ability to support or provide admissible evidence to support its damages for the first time at trial, summary judgment in Revolution's favor is proper.

(ECF No. 47, at 18).

Plaintiff does not contest that a failure to compute damages would result in the dismissal of this claim.  It is well settled that such a failure can be fatal to a tortious interference claim. *Koury v. City of Canton*, 221 F.App'x. 379, 387 (6th Cir. 2007).  Instead, Plaintiff argues that it has produced evidence of damages through the discovery process.  (ECF No. 55, at 21).  Plaintiff states it "has identified the customers whose loan documents and NPI were transmitted to Revolution, and Equity's profit margins per loan.  *Id*.  Further, near the end of discovery, Revolution produced its loan documents – which show the size and types of loans that were closed at Revolution – as well as its credit pulls – which will show which customers had loan applications started at Revolution after they initially started with Equity."  (*Id*., at 21–22).  Given the scope of this discovery, Plaintiff contends "there is more than enough evidence in the record for the Court to make a 'just and reasonable estimate of the damage based on the relevant data.'" (*Id*., at 22).  The Court concurs with Plaintiff.

Plaintiffs in civil cases must prove damages.  However,

> The Plaintiffs need not prove the amount of damages with mathematical certainty. *Sir Speedy*, 957 F.2d at 1038; *Massman Constr. Co. v. Tenn. Valley Auth*., 769 F.2d 1114, 1123 (6th Cir. 1985) (quoting *Wunderlich Contracting Co. v. United States*, 173 Ct. Cl. 180, 351 F.2d 956, 968-69 (Ct. Cl. 1965)). The Plaintiffs, however, are required to set forth evidence sufficient to allow the Court to make a reasonable estimate of damages. *Sir Speedy*, 957 F.2d at 1038 ("In order to recover damages, a claimant must present evidence that provides the finder of fact with a reasonable basis upon which to calculate the amount of damages."); *Massman Constr. Co*., 769 F.2d at 1123 ("It is sufficient if [the plaintiff] furnishes the court with a reasonable basis for computation, even though the result is only approximate."); *Volasco Prods*., 308 F.2d at 392 ("The evidence must furnish some approximation of the

actual damages so that they may be determined with reasonable certainty."); *see Zazu Designs v. L'Oreal*, S.A., 979 F.2d 499, 505 (7th Cir. 1992) ("Although uncertainty created by wrongful acts does not insulate the wrongdoer from liability, 'people who want damages have to prove them ….'") (quoting *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415 (7th Cir. 1992)). The Supreme Court, in establishing the rule that a wrongdoer must bear the burden of the risk of uncertainty created by his own wrong, provided the following explanation:

"In such a case, even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances, "juries are allowed to act on probable and inferential as well as (upon) direct and positive proof.

*Owner-Operator Indep. Drivers Assn v. Arctic Express, Inc.,* 288 F. Supp. 2d 895, 907–

908 (S.D. Ohio 2003)

Here, viewed in the light most favorable to its side, Plaintiff has set forth sufficient

evidence to allow the jury to make a reasonable estimate of damages. Plaintiff has shown the

Court a list of the customers whose loan documents and NPI were transmitted to Revolution,

"loan documents – which show the size and types of loans that were closed at Revolution,"

"credit pulls – which will show which customers had loan applications started at Revolution after

they initially started with Equity," and Equity's expected profit margin per loan. (ECF No. 55, at

21–22). From this, the jury may make a just and reasonable estimate of the number of loans lost

due to Revolution's interference, and the amount of lost profit per loan. The jury has enough

information to calculate Equity's damages, should they find Revolution liable.

Finally, Defendant argues that summary judgment is appropriate because Plaintiff's claim

is preempted by OUTSA, the Ohio Uniform Trade Secrets Act. This argument is novel, as

Defendant failed to include it in its summary judgment motion. Rather, Defendant brought it up

only in its reply.[1]  Defendant argues "A tortious interference claim is predicated on a 'wrongful act,' and when the 'wrongful act' is the misappropriation of a trade secret, then the tortious interference claim is preempted."  (ECF No. 15).

Plaintiff contends Defendant's argument fails for two reasons.  First, "Revolution's arguments concerning preemption" are waived because they "were not raised at all in its opening Memorandum in support of its Motion for Summary Judgment."  (ECF No. 69, at 1).  And second, "Equity's tortious interference claim is not preempted because it is predicated on facts and proofs that go well beyond the facts underlying Equity's OUTSA claim."  (*Id*., at 2).  Plaintiff's first argument is not successful.  "This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived." *Kuhn v. Washtenaw County*, 709 F.3d 612, 624 (6th Cir. 2013) (Citing *Caudill v. Hollan*, 431 F.3d 900, 915 n.13 (6th Cir. 2005)).  However, the rationale behind this rule is to provide the non-movant with an opportunity to respond to the movant's facts and argument.  As Plaintiff has been afforded the opportunity to respond to Defendant's argument, the rule's motivating rationale is lacking in this case.

However, while Defendant has not waived the preemption argument, it still cannot prevail.  OUTSA preempts common law actions based on the misappropriation of trade secrets.  "OUTSA should be understood to preempt not only causes of action for misappropriation of trade secrets but also causes of action that are based in some way on misappropriation of trade secrets."  *Stolle Mach. Co., LLC v. Ram Precision Industries*, 605 F.App'x 473, 485 (6th Cir. 2015).  "The test to determine whether a state law claim is displaced by OUTSA is to determine

---

[1] To ensure that this issue was fully briefed, the Court ordered Plaintiff to file a Sur-Reply.  (ECF No. 68).  Plaintiff did so.  (ECF No. 69).

whether 'the claims are no more than a restatement of the same operative facts' that formed the basis of the plaintiff's statutory claim for trade secret misappropriation." *Id.*, 486 (citing *Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 989 (N.D. Ohio 2008)). "Where the state-law claim has a factual basis independent from the facts establishing the OUTSA claim, 'the portion of the claim supported by an independent factual basis survives preemption.'" *Id.* (citing *Miami Valley Mobile Health Services, Inc. v. ExamOne Worldwide, Inc.,* 852 F. Supp. 2d 925, 940 (S.D. Ohio 2012).

Here, Plaintiff has produced evidence showing an independent factual basis for its state law claim. Taken in the light most favorable to Plaintiff, it has shown an inducement of Plaintiff's employees to act in Defendant's best interest and redirect customers from Equity to Revolution. (ECF No. 69, at 3–4). However, while Plaintiff's state law claim does have an independent basis, there is also substantial overlap between the claim and Plaintiff's OUTSA claim. To the extent that the two claims overlap, OUTSA preempts Plaintiff's Tortious Interference with Advantageous Business Relationships and Prospective Economic Advantage claim. Revolution's Motion for Summary Judgment is **DENIED IN PART** and **GRANTED IN PART**.

### ii. Count Four

Defendant has moved for summary judgment on Count Four, Conversion. In Ohio, "[a] conversion claim 'is recognized as any exercise of dominion or control wrongfully exerted over the personal property of another in denial of or under a claim inconsistent with his rights.'" *Gorsha v. Clark*, No. 2:18-cv-508, 2022 U.S. Dist. LEXIS 16485 (S.D. Ohio Jan. 31, 2022) (quoting *Ohio Tel. Equip. & Sales, Inc. v. Hadler Realty Co.*, 24 Ohio App. 3d 91, 93, 493 N.E.2d 289, 292 (1985)). "The elements of a conversion action are: (1) the plaintiff had

ownership or right of possession of the property at the time of conversion; (2) the defendant

converted plaintiff's property by a wrongful act or disposition; and (3) resulting damages."

*Metro. Title Agency, Inc. v. Fed. Express Corp.*, No. 3:22-CV-00094, 2023 WL 2600397, at *7

(S.D. Ohio Mar. 22, 2023) (Citing *Dice v. White Family Cos., Inc.*, 878 N.E.2d 1105, 1109 (Ohio

App. 2007).

Here, Defendant maintains that "Equity's claim for conversion fails because Equity

cannot show any personal property converted by Revolution." (ECF No. 47, at 18). It argues;

> Equity does not own borrowers or potential borrowers, especially those to whom
> Equity is introduced by self-generating loan officers with their own pre-existing
> referral sources and books of business. And Equity does not have an ownership
> right in its customers or their contact information because, as Anderson testified, 'a
> customer can work with [whomever] they choose to.'

(ECF No. 47, at 18–19).

Essentially, Defendant argues Plaintiff cannot fulfill the first prong of the conversion

action. Plaintiff disagrees, stating "Equity has proffered substantial evidence showing that

Revolution deliberately misappropriated Equity's customer database and customer NPI and loan

documents, and in fact induced and equipped its newly recruited employees to upload those

materials into Revolution's computer systems." (ECF No. 55, at 22). The Court agrees with

Plaintiff.

In response to Defendant's motion, Plaintiff points to several different forms of property

converted by Revolution. This includes Plaintiff's customer database, loan documents

containing NPI, and the Encompass Instructions. (ECF No. 55, at 22–23). The database

contains the names of individuals who are "actively communicating with Equity about closing a

loan." (ECF No. 55, at 9). As such, the names in the database constitute a business opportunity.

While Revolution is correct that "Equity does not own borrowers or potential borrowers," Equity

can have an interest in a business opportunity. (ECF No. 47, at 18). Thus, despite the at will nature of the relationship between Equity and its prospective customers, when the evidence is taken in the non-movant's best light, Revolution may still have converted Equity's property.

Further, the Court finds Equity had an interest in the customer NPI and Encompass Instructions. As discussed later in the Court's analysis on Count Nine, the law is clear that client databases and customer non-public information can be protected as a trade secret. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 183 (Ohio 1999); *MNM & MAK Enterprises, LLC v. HIIT Fit Club, LLC*, 134 N.E.3d 242 (Ohio Ct. App. 2019); *Staskus v. Gene Weiss' Place for Fitness*, 1998 U.S. App. LEXIS 9609. As such, Equity does have an ownership right in its customer NPI. Additionally, as discussed in the same section, Equity has carried its burden in regard to the Encompass Instructions. Thus, Equity has shown a genuine dispute of material fact as to the first prong of the conversion action.

Defendant argues in the alternative that summary judgment is appropriate because Plaintiff's claim is preempted by OUTSA, the Ohio Uniform Trade Secrets Act. Like its other preemption arguments, Defendant mentioned this position only in its Reply. Plaintiff, in its Sur-Reply, contends Revolution's argument fails because the conversion claim "is based on Revolution's usurpation of Equity's business opportunities and valuable property rights, which go beyond the scope of Equity's trade secrets claim." (ECF No. 69, at 5). The Court concurs with Plaintiff.

As mentioned above, OUTSA preempts common law claims based on the misappropriation of trade secrets. "The test to determine whether a state law claim is displaced by OUTSA is to determine whether 'the claims are no more than a restatement of the same operative facts' that formed the basis of the plaintiff's statutory claim for trade secret

misappropriation." *Stolle Mach. Co., LLC v. Ram Precision Industries*, 605 F.App'x 473, 486

(6th Cir. 2015) (citing *Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 989 (N.D. Ohio 2008)).

Here, Plaintiff has produced evidence showing an independent factual basis for her state

law claim. Taken in the light most favorable to the non-movant, Plaintiff has shown that

Defendant has not only stolen its trade secrets, but that it then used those secrets to convert

business opportunities. (ECF No. 69, at 6). This goes beyond the operative facts necessary to

prove Plaintiff's OUTSA claim. However, while Plaintiff's state law claim does have an

independent basis, there is also substantial overlap between the claim and Plaintiff's OUTSA

claim. To the extent that the two claims overlap, OUTSA preempts Plaintiff's state law

conversion claim. Defendant's Motion for Summary Judgment is **DENIED**.

### iii. Count Five

Defendant has moved for summary judgment on Count Five, Unfair Competition. The

test for unfair competition in Ohio is the same as the test under federal law. *Microsoft Corp. v.

McGee*, 490 F. Supp. 2d 874, 880 (S.D. Ohio 2007). In Ohio "[u]nfair competition ordinarily

consists of representations by one person, for the purpose of deceiving the public, that his goods

are those of another." *Water Mgmt., Inc. v. Stayanchi*, 15 Ohio St. 3d 83, 85 (Ohio 1984). That

is the argument Plaintiff appears to be making here. (ECF No. 55, at 23–24).

Defendant maintains that "Equity's claim for unfair competition fails because Ohio only

recognizes a common law action for unfair competition in very narrow circumstances that have

no application here." (ECF No. 47, at *ii*). It argues "there are no facts supporting trademark

infringement, malicious litigation, false rumors, or publication of statements designed to harm

another's business." (*Id.*, at 20). Plaintiff responds by pointing to "[t]he email correspondence

between the Former Employees while Thoman was still at Equity, and Roberts and Dugger were at Revolution." (ECF No. 55, at 23–24). Plaintiff alleges that, through this correspondence, "in several instances, consumers received communications containing both Equity's and Revolution's names." (ECF No. 55, at 24). "Under these circumstances, it is highly likely that customers would experience confusion regarding 'source' of the loan products they were going to obtain." (*Id.*). Further, Plaintiff argues that Revolution's encouragement of the Former Employees to transfer customers and NPI to Revolution via email has therefore created a high likelihood of customer confusion." (*Id.*). The Court agrees with Defendant.

Both Plaintiff's arguments fail. First, the only evidence Plaintiff cites in support of its customer confusion argument is the declaration of Ari Karen. (ECF No. 55, Exhibit 14)[2]. This declaration references a series of emails regarding a discovery dispute between the parties. Plaintiff did not cite to any email in particular, but to the document generally. The Court sees nothing in the Exhibit 14 that would confuse a reasonable customer as to the source of their loans. Further, although Plaintiff did not cite to it, Exhibit 16 is titled on the docket "Emails Likely to Confuse Consumers." However, the document does not contain any "communications containing both Equity's and Revolution's names." (ECF No. 55, at 24).

Second, any transfer of customer NPI to Revolution is irrelevant to the claim of unfair competition. That claim rests on the representations, or more accurately the misrepresentations, that Defendant has made to others. The mere facts that Revolution had Equity NPI or knew their customers are irrelevant. Plaintiff has presented no evidence that Revolution used the NPI to deceive Equity customers into believing that they were to receive an Equity mortgage when they

---

[2] Under the Plaintiff's numbering system, this is Exhibit 13. Under the Court's system, it is Exhibit 14.

actually were to receive a Revolution mortgage. As such, Plaintiff has failed to make out a claim for unfair competition. Defendant's motion for summary judgment on Plaintiff's Unfair Competition claim is **GRANTED**.

### iv. Count Eight

Defendant has moved for summary judgment on Count Eight, Civil Conspiracy. In Ohio, "[a] civil conspiracy is 'a malicious combination of two or more persons to injure another person or property, in a way not competent for one alone, resulting in actual damages.'" *Addison Holdings, LLC v. Fox, Byrd & Co., P.C.*, 4th Dist. Jackson No. 21CA8, 2022-Ohio-4784 (quoting *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419, 1995- Ohio 61, 650 N.E.2d 863 (1995)). Civil Conspiracy is not an independent cause of action. *Id.* Instead, "to prevail upon a civil conspiracy claim, a plaintiff must demonstrate the existence of an underlying unlawful act." *Id.* (citing *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d 464, 475, 1998- Ohio 294, 700 N.E.2d 859 (1998)).

Here, Defendant maintains that "Equity has not produced evidence to support any of the elements of a claim for civil conspiracy." (ECF No. 47, at 20). It argues "Equity cannot show that Revolution committed an 'underlying unlawful act' and cannot show damages. Equity has produced no evidence of any injury occurring in a way not competent for one person alone. Additionally, Equity has not produced evidence of damages arising from Revolution's conduct." (*Id.*). In response, Plaintiff does not cite to any underlying unlawful act in the record. Instead, it contests Defendant's argument with only brief, conclusory statements. It states "the record shows that Revolution provided Roberts with instructions on how to upload Equity's database to Revolution's CRM system, and then used Equity's database for marketing purposes. As a result,

numerous loans for which customers initially applied and started files with Equity were closed with Revolution."  (ECF No. 55, at 24).

The Court finds for Defendant.  The Plaintiff has not pointed the Court to any underlying unlawful act which could support the claim for civil conspiracy.  Plaintiff fails to show "sufficient evidence from which a jury could reasonably find for" it. *See Anderson Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).  Defendant's motion for summary judgment on Plaintiff's Civil Conspiracy claim is **GRANTED**.

### v.  Count Nine

Defendant has moved for summary judgment on Count Nine, Misappropriation of Trade Secrets in Violation of Ohio's Uniform Trade Secrets Act (OUTSA).  Plaintiff has also moved for summary judgment on this count.  In Ohio, "to establish a cause of action for misappropriation of trade secrets, a plaintiff must prove by a preponderance of the evidence that 1) a trade secret exists; 2) the trade secret was acquired as a result of a confidential relationship; and 3) the trade secret was acquired as a result of the unauthorized use of the secret." *Kendall Holdings, Ltd. v. Eden Cryogenics LLC,* 630 F. Supp. 2d 853, 861 (S.D. Ohio 2008); *see also Hoover Transp. Serv., Inc. v. Frye*, 77 Fed. App'x. 776, 782 (6th Cir. 2003) (per curiam). Further, damages are a necessary element for recovery.

The parties dispute whether Plaintiff can establish the elements necessary to sustain this cause of action.  The Court will take each element in turn.

### 1. Existence of Trade Secret

A trade secret is:

"information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

R.C. § 1333.61(D)

When looking to determine if a trade secret exists, courts look to six factors.

"(1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information."

*Kendall Holdings, Ltd. v. Eden Cryogenics LLC,* 630 F. Supp. 2d 853, 861 (S.D. Ohio 2008)

Here, Plaintiff claims that Defendant misappropriated three categories of trade secrets. These are Equity's customer database, loan documents containing customer NPI, and the Encompass Instructions. (ECF No. 46, at 6). Defendant denies that any of these categories of documents are protectable as trade secrets. (ECF No. 47, at 21). Both parties contend that the record so indisputably supports their position that there is no genuine dispute of material fact on the matter. The Court disagrees.

Plaintiff has presented evidence that, when viewed in the light most favorable to the Plaintiff, can establish that the Equity's customer database and customer NPI are protectible as trade secrets. Plaintiff has presented evidence that the database is only accessible to certain Equity employees (ECF No. 46, Exhibit 5, at 1), that the database is password protected (*Id.*), that the database and NPI took effort and money to acquire and compilate (*Id.*, at 2–3), and that they both are valuable to Plaintiff's business (*Id.*, at 3). Additionally, employees of Equity were required to sign a confidentiality agreement, swearing to keep confidential any information gleaned from their employment with Equity. Further, it is well established in Ohio that customer lists and customer NPI can be protected as trade secrets. *See Siegel*, 85 Ohio St.3d at 181-82 (Ohio Sup. Ct. 1999); *MNM & MAK Enterprises*, LLC v. HIIT Fit Club, LLC, 134 N.E.3d 242, 250–51 (Ohio Ct. App. 2019); *Al Minor & Assoc., Inc. v. Martin*, 117 Ohio St.3d 58, 63-64 (Ohio 2008).

Plaintiff has satisfied its burden with respect to the third category of trade secret, the Encompass Instructions, as well. Plaintiff has presented evidence that the instructions "were created by Equity Resources," "for the exclusive use of Equity Resources employees," "were confidential and not publicly available." (ECF No. 46, Exhibit 5, at 2). Additionally, Defendant's Chief Compliance Officer Ari Karen stated that these instructions were a "job aid." (ECF No. 46, Exhibit 2, at 57). As such, Plaintiff has a colorable argument that the instructions were explicitly covered under Defendant's confidentiality agreement with its Former Employees. (ECF No. 55, Exhibit 1, at 4). While Defendant has presented evidence that this document was publicly available and not created by Equity, Plaintiff's evidence creates as genuine dispute of fact on these points. (ECF No. 53, Exhibit 7, at 4–5). Plaintiff has carried its burden, as has Defendant.

21

## 2.  Confidential Relationship

Plaintiff has presented evidence that it required Former Employees to sign confidentiality agreements during their employment.  (ECF No. 46, Exhibit 1, at 4).  Further, it is not disputed that Former Employees acquired the purported Trade Secrets during their time at Equity. Plaintiff has carried its burden as to this element.

## 3.  Unauthorized Use

The parties have presented conflicting evidence as to whether Former Employees use of the aforementioned trade secrets was authorized.  Plaintiff points out evidence tending to show that Revolution's use of the Trade Secrets was unauthorized.  Plaintiff has presented evidence indicating that Revolution "provided Roberts with instructions on how to upload Equity's customer database into Revolution's CRM system" (ECF No. 55, at 15), that Revolution "subsequently used Equity's database" (*Id*.), that the database was "unique" to Equity (ECF No. 46, Exhibit 5, at 2), that the Encompass instructions were developed for Equity's exclusive use (*Id*., at 2), and that the customer NPI was unavailable to the public (*Id*., at 2).

On the other hand, Defendant has presented evidence that, when viewed in the light most favorable to Defendant, can establish that Revolution was authorized to use Equity's customer database.  Defendant pointed to the declaration of Roberts, in which she stated that the "database information was downloaded off of Equity's system" and provided to her by "an Equity employee."  (ECF No. 47, Exhibit 1, at 3).  Defendant also points to a deposition of Plaintiff employee Tony Anderson, in which he stated that it was "customary" for Equity to release certain information to exiting employees.  (ECF No. 47, Exhibit 10, at 89–90).

Defendant has also presented evidence that can establish Revolution was authorized to use loan documents with customer NPI.  Defendant points out that it is undisputed that the individual who sent Roberts and Dugger the customer NPI was an Equity employee at the time and argues that, even if that employee was not explicitly authorized to do so, she had apparent authority.  (ECF No. 60, at 12).

Finally, Defendant carried its burden of showing a genuine dispute of material fact as to whether Revolution was authorized to use the Encompass Instructions.  Defendant has presented an affidavit from Chief Compliance Officer Sally Wood, stating that Revolution was already following the procedures outlined in the Encompass Instructions.  (ECF No. 53, Exhibit 7, at 4–5).  Additionally, Roberts testified that she sent herself the document only so she didn't need to search for it online.  (ECF No. 53, Exhibit 3, at 114–115).

At the summary judgment stage, the Court cannot and will not weigh the parties' evidence.  The Court finds there to be a genuine dispute of material fact.

### 4.  Damage

The parties dispute whether Plaintiff can establish damages for the loss of its trade secrets.  As the Court made clear in the section on Count Two, viewed in the light most favorable to its side, Plaintiff has set forth sufficient evidence to allow the jury to make a reasonable estimate of damages.  Plaintiff has presented enough evidence to satisfy its burden.

### 5.  Plaintiff's Respondeat Superior Argument.

Plaintiff also argues that Revolution is vicariously liable for the actions of Former Employees.  Thus, their knowledge and intentional interference are imputed to Revolution.  It

states, "Revolution is inherently responsible for the intentional wrongdoing of its employees."
(ECF No. 55, at 15).

Plaintiff's vicarious liability argument fails.  "In Ohio, the doctrine of respondeat superior
can hold an employer or principal vicariously liable for the tort of its employee or agent in
certain circumstances." *Keller N. Am., Inc v. Earl*, No. 1:20-CV-2401, 2021 WL 3737915, at *3
(N.D. Ohio Aug. 24, 2021).  To succeed in rendering a principal vicariously liable for its agent's
actions, a Plaintiff must show "(1) that a principal-agent relationship exists (e.g., employer and
employee) and (2) that the perpetrator committed a tortious act within the scope of employment."
*Id*.  "When the tort is intentional, the behavior giving rise to the tort must be calculated to
facilitate or promote the business for which the servant was employed." *Id*.

Plaintiff has presented evidence that Former Employees had a principal agent relationship
with Revolution and argues that any misappropriation of Trade Secrets occurred in the scope of
their employment.  (ECF No. 55, at 15).  However, the question of whether any
misappropriation occurred is in dispute, as mentioned above.  As such, Plaintiff cannot be
afforded summary judgment.

Both Plaintiff's Motion for Summary Judgment and Defendant's Motion for Summary
Judgment are **DENIED.**

### vi.  Count Ten

Defendant has moved for summary judgment on Count Ten, Violation of the Defend
Trade Secrets Act, 18 U.S.C. § 1836 et eq.  Plaintiff has also moved for summary judgment on
this count.  "To state a claim for misappropriation of trade secrets under the Defend Trade
Secrets Act ('DTSA'), 18 U.S.C. §§ 1831-1839, a plaintiff must show: (1) the existence of a

protectable trade secret; and (2) the misappropriation of the trade secret by defendant." *Int'l Petro. Prods. & Additives Co. v. PXL Chems. BV*, No. 1:20-cv-00586, 2022 U.S. Dist. LEXIS 176951, at * 36 (S.D. Ohio Sept. 28, 2022).  A "'[t]rade secret'" is defined similarly under both the DTSA and the OUTSA: it entails 'information' that the owner seeks to protect as confidential and that has economic value from not being publicized." (*Id.*).  "Courts consider these state and federal law claims together because the definition and requirements of the OUTSA and DTSA are essentially the same." *Sunjoy Indus. Group., Ltd. v. Permasteel, Inc.*, No. 2:22-cv-1896, 2023 U.S. Dist. LEXIS 13257, at *20-21 (S.D. Ohio Jan. 25, 2023).  As such, just as with Count Nine, both Defendant's and Plaintiff's motions for summary judgment are **DENIED** as to Plaintiff's Violation of the Defend Trade Secrets Act.

## V.     Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion for Summary Judgment.  (ECF No. 47).  Also **DENIED** is Plaintiff's Motion for Summary Judgment.  (ECF No. 46).   This case is to remain open.

**IT IS SO ORDERED.**

**7/17/2023**                                              **s/Edmund A. Sargus, Jr.**
**DATE**                                                    **EDMUND A. SARGUS, JR.**
                                                                **UNITED STATES DISTRICT JUDGE**